GEORGE B. MARTIN, JR., Respondent-Appellant, v SANDRA A. MARTIN, Appellant-Respondent.

SANDRA A. MARTIN, Appellant-Respondent, v GEORGE B. MARTIN, JR., Respondent-Appellant.

Fourth Department, May 23, 1980

APPEARANCES OF COUNSEL

*Koren, Bertell & Hoey (John T. Bertell* of counsel), for appellant-respondent.

*Ellis, Kustell & Mullenhoff (Carl B. Kustell* of counsel), for respondent-appellant.

## OPINION OF THE COURT

SIMONS, J. P.

Plaintiff George Martin has been granted a divorce based upon his wife's adultery and her cruel and inhuman treatment. The court also awarded him custody of the children of the marriage. In a countersuit (resolved in the same judgment) Sandra Martin was granted a divorce on the grounds of her husband's cruelty and in that action the court found the separation agreement between the parties "unfair" and granted the wife's application to rescind it. George Martin appeals from so much of the judgment as voided the separation agreement and ordered him to pay his wife's counsel fees; Sandra Martin appeals from the judgment's custody provisions.

The parties were married in 1961 and lived together until 1977. They have three children: Michelle, born January 29, 1964; Susan, born October 24, 1966; and Brent, born April 13, 1968. Plaintiff is a salesman working primarily out of his home, and at the times involved in this litigation his net income was approximately $20,000. Defendant was a trained hospital technician but she had been a housewife for many years. After the parties separated she worked part time as a sales clerk.

In February, 1977 defendant told her husband that she was involved with another man, Benjamin Rathbun, and that she wanted a divorce. In an effort to save the marriage, plaintiff asked her to seek counseling from their minister. Defendant met with the minister alone several times and they counseled together with him on three or four occasions. The efforts were unsuccessful and the sessions shortly developed into negotiations for a proposed property settlement. After the parties agreed on a number of items, their agreement was typed by their minister, they made handwritten additions or corrections to it, and defendant then took it to her attorney to be formalized into a separation agreement. Plaintiff consulted an attorney but he was not represented at either the preliminary

discussion with his wife's lawyer or when the agreement was executed on April 19, 1977.

Defendant contends that the agreement is unconscionable, that she was induced to sign it by her husband's fraud and overreaching and that it should therefore be rescinded. Specifically, she refers to the provision by which she agreed to convey her equity in the marital home for $7,500.[1] The house was originally purchased for $36,000 and mortgaged for an undisclosed amount. The property has not been appraised, but it was the general estimate of the parties that at the time of their separation the house was worth between $50,000 and $60,000 and the mortgage principal then due was approximately $11,000.

The other provisions of the separation agreement provided: that defendant could stay in the house for one year (so that the children could continue to live there and attend the same school during the 1977-1978 school year); her husband agreed to pay all taxes, insurance and mortgage expenses, and she was to pay household and utility expenses; defendant received all the household furniture (except tools), a 1977 automobile fully paid for and one half of all the parties' bank accounts and securities. The parties also owned a boat which they agreed to share during the summer of 1977. After that it was to belong to the wife. Apparently defendant contributed nothing to the purchase of the house, but it was explained that in 1972 defendant's father had died and some of the other assets were purchased with the approximately $20,000 that she inherited from him.

The custody and support provisions of the agreement provided that the children were to remain with their mother for the time being. Plaintiff agreed to pay $75 per week for their support and to provide for their medical and dental care and he agreed to pay $35 per week to defendant for one year or unless she sooner remarried. The one-year limitation was agreed upon because the parties understood that defendant intended to seek a job and that the alimony was to tide her over until she was able to support herself. The agreement stated that both parties had executed it voluntarily and after ascertaining and weighing "all of the facts and circumstances likely to influence their judgment".

---

1. She alleged in the complaint that the agreement was void also because of the provision for alimony which terminated after one year. In view of the results of the divorce actions, this contention is without merit (see Domestic Relations Law, § 236).

## I

We consider first the validity of the property settlement.

It is the policy of the courts to encourage parties to settle their differences privately. Agreements fairly executed after negotiation and full disclosure of all relevant facts should not be casually undone and the bargain redesigned to satisfy a court's retrospective idea of what is important or wise. Nevertheless, a court of equity may set aside an agreement that is unconscionable, that is, one in which the bargain is such that " 'no man in his senses and not under a delusion would make on the one hand, and * * * no honest or fair man would accept, on the other' * * * (Hume v. United States, 132 U. S. 406 [, 411]) * * * [the inequality being] 'so strong and manifest as to shock the conscience and confound the judgment of any man of common sense' " (Mandel v Liebman, 303 NY 88, 94, quoting from Osgood v Franklin, 2 Johns Ch 1, 23 [KENT, C.], affd 14 Johns 527; and see Christian v Christian, 42 NY2d 63, 71).

A separation agreement stands on somewhat different ground since a husband and wife share a confidential relationship requiring that they exercise the utmost good faith in contracting with each other (see Christian v Christian, supra, 63, 72), even when the marriage is breaking up (see Simonds v Simonds, 45 NY2d 233). It may be set aside as unconscionable because of facts which would be insufficient to vitiate a contract between strangers. When reviewing a separation agreement, the court may examine its terms "to see if there is an inference, or even a negative inference, of overreaching in its execution. If the execution of the agreement, however, be fair, no further inquiry will be made" (Christian v Christian, supra, p 73; Stern v Stern, 63 AD2d 700).

If there was overreaching in this case, it must be based entirely on plaintiff's nondisclosure because the record does not contain evidence of fraud, misrepresentation or undue influence on his part. Defendant wishes us to hold, inferring that this agreement is unconscionable because of the disparity between the consideration paid to her to convey her interest in the marital home and her estimate of the value of her share of the equity. It is important to note that the dispute does not concern a claim of hidden assets. The concealment, if such there was, related only to the marital residence and the parties' equity interest in it as determined by their estimates of value, reduced by the amount of the mortgage debt, a sum

which was easily ascertainable. Thus, we look to the bargain to see whether defendant's agreement was an act of free will, made with full knowledge of the relevant facts, and whether, for his part, her husband acted in good faith, bearing in mind the rule that a husband's failure or refusal to disclose his financial circumstances when the agreement is executed is not sufficient to void an agreement fair on its face, particularly when the wife was represented by counsel during the negotiations and execution *(Riemer v Riemer,* 31 AD2d 482, affd 31 NY2d 881; *Ronson v Ronson,* 58 AD2d 987; *Stahl v Stahl,* 16 AD2d 467; cf. *Stern v Stern, supra).*

This agreement was the subject of extensive negotiation during conferences in which defendant had the advice of her minister and her lawyer. It may be inferred that she accepted the bargain freely because she complied with its terms for almost a year until her husband sued for divorce and she commenced her countersuit and because her minister testified that even after discovering the amount of the equity (which he had not known during the negotiations), he still considered the bargain fair in view of what defendant had told him privately.

Furthermore, the record established that defendant executed the agreement with knowledge of the relevant facts. Both the minister and defendant's former lawyer testified that she knew her husband's general financial condition. Indeed, the minister believed that the financial terms of the agreement were based upon information she supplied to him. Her lawyer testified that when he was counseling her he asked her about the amount of the mortgage and she "wasn't quite sure * * * around $10,000 or $11,000." He added that she "well knew Mr. Martin's financial * * * she had other arrangements * * * the house would not affect her." Defendant denies that she had any knowledge of the amount of the mortgage debt, but whether or not she knew it, she knew that the house had cost only $36,000 originally and she knew, her lawyer knew and her minister knew that the value of the house had increased substantially over the years to approximately $50,-000 to $60,000. Manifestly, if payments had been made on the mortgage from the time of purchase, an equal half of the equity was worth far more than the $5,000 which she originally agreed to accept in settlement or the $7,500 that she finally received, and she must have been aware of that fact (see *Ronson v Ronson, supra).*

■ Moreover, even if it could be said that the husband failed in some duty of good faith, the agreement should not be rescinded because his wife was not misled and did not rely upon his misconduct (see *Matthews v Schusheim,* 42 AD2d 217, 221, affd 35 NY2d 686). She accepted the terms of the agreement and executed it because she believed agreement was necessary. Their minister did not feel free to specify important considerations which he said influenced defendant's judgment and induced her to agree to the settlement, but it was his testimony that defendant wanted a divorce and plaintiff had to be "talk[ed] * * * into" the separation agreement. Her attorney was considerably more blunt on the subject, testifying that although defendant wanted a divorce, she advanced no fact from which he could advise her that she could successfully prosecute a divorce action. Because of this and because she was anxious to avoid unfavorable publicity concerning her adultery, she had to try to obtain a conversion divorce by proposing a separation agreement that her husband would accept.[2] Rathbun had recently been divorced by his wife and plaintiff testified that defendant told him that she was not interested in the house because she intended to live with Rathbun anyway.

In view of this evidence, the disparity between the consideration paid for conveyance of defendant's equity and its actual value is understandable. The agreement as a whole represents a bargain which someone in her position might reasonably accept in an effort to resolve her marital difficulties. Certainly, it does not "shock the conscience and confound" our judgment, and the court erred in setting it aside and formulating a new division of the marital property for the parties.

## II

Next, we consider the court's determination on custody.

It is familiar law that in a proceeding involving two natural parents custody is to be determined solely by what is in the best interest of the child and the disposition of the trial court should not be reversed in the absence of manifest error or an abuse of discretion (see Domestic Relations Law, §§ 70, 240; *Opferbeck v Opferbeck,* 57 AD2d 1074; *People ex rel. Destasio*

---

2. Mrs. Martin's present lawyers, who did not represent her in preparing the agreement, developed evidence sufficient to support a divorce for her on the grounds of cruelty and a conversion divorce was not pursued.

*v Perruzza,* 277 App Div 996). We have held that when children have been living with one parent for a long period of time and the parties have previously agreed that custody shall remain in that parent, their agreement should prevail and custody should be continued unless it is demonstrated that the custodial parent is unfit or perhaps less fit (see *Matter of Arcarese v Monachino,* 58 AD2d 1030; *Opferbeck v Opferbeck, supra; Papernik v Papernik,* 55 AD2d 846; see, also, *Matter of Ebert v Ebert,* 38 NY2d 700). This rule, that priority should be given to the parent first awarded custody, is applied "not as an absolute but as a weighty factor" *(Matter of Nehra v Uhlar,* 43 NY2d 242, 251; see *Matter of Corradino v Corradino,* 64 AD2d 320, affd 48 NY2d 894). It is but another way of saying that custody should be established on a long-term basis and children should not be "shuttled back and forth between divorced parents merely because of changes in marital status, economic circumstances or improvements in moral or psychological adjustment, at least so long as the custodial parent has not been shown to be unfit, or perhaps less fit, to continue as the proper custodian" *(Obey v Degling,* 37 NY2d 768, 770).

██ Defendant contends that since the separation agreement provided that she was to have custody and the court did not find her unfit, it erred in deciding the issue by applying the best interest rule and transferring custody of the children to her husband.[3] We think Trial Term proceeded correctly when it declined to give controlling weight to the custody provisions of the separation agreement or to the fact that the children had previously lived with their mother after their father moved out of the house.

This unusual agreement provided that the mother was to have custody of the children, they to remain in the marital home with her to the conclusion of the 1977-1978 school year so that they would not have to change schools. (The agreement specified that defendant's right to possession terminated on June 20, 1978 or when she sooner remarried. Apparently, the parties anticipated that the house would be sold or that plaintiff would return to it at that time.) The father was given reasonable rights of visitation, at the invitation of the mother "in accordance with an agreed plan [which was unspecified] with consideration being give *[sic]* to the convenience and the least disruption of the lives of the children." The agreement

---

**3.** She maintains that the custody provision was severable from the unconscionable provisions of the property settlement (see *Ferro v Bologna,* 31 NY2d 30, 35-36).

further provided that the children were permitted to visit their father as they wished and when they wished, overnight or for a week or more, and the father could take the children to Florida to visit their grandparents. The children's school commitments apparently provided the only inhibition on these visits. Finally, the agreement provided that "it is expressly understood and agreed that the children are of sufficient age that their choice of parent with whom to reside shall be respected and if needs be a written consent of change of Guardian to the Husband shall be signed by the Wife if a child so desires."

The natural sense of these provisions is that the parents made no determination of permanent custody. The decision resided ultimately and exclusively with the children and for that reason the agreement is not entitled to controlling weight. Prior determinations of custody, whether contained in voluntary agreements or court orders, are accorded priority because they reflect a considered and experienced judgment of what is best for the long-term interests of the children and because honoring them provides stability to the child's life. But this agreement did not address or resolve long-term custody of the children. Custody was premised solely on the wishes of the children themselves without even superficial consideration of what was to happen to them after school ended in 1978. A child's preference of custody is important, and particularly so if the child is mature, but it is not controlling for the simple reason that a young child beset by the trauma of a broken home and the competing claims of two parents is not competent to weigh intelligently the factors necessary to make a wise choice on custody (see *Matter of Nehra v Uhlar,* 43 NY2d 242, 249, *supra; Matter of Ebert v Ebert,* 38 NY2d 700, 702, *supra; Dintruff v McGreevy,* 34 NY2d 887, 888). Certainly a separation agreement in which custody is determined solely upon the wishes of the young children involved is not a "weighty factor" which should control the court's judgment.[4]

■ ■ Applying the best interest test, therefore, we affirm the court's determination that the children should be with plaintiff. It appears from the evidence that he has been an affectionate and concerned father, attentive to his children's welfare and participating in their activities even when sepa-

4. Ironically, were we to hold this agreement decisive, as the mother wishes, it appears from the record that the children would not prefer to stay with her.

rated from them. Since the divorce he has remarried and the children have adapted well to his new wife. The mother has shown affection and concern for the children also. Apparently, she has tried to be discreet in her affair with Mr. Rathbun and her adultery would not *ipso facto* warrant her loss of custody (see *Opferbeck v Opferbeck,* 57 AD2d 1074, *supra; Papernik v Papernik,* 55 AD2d 846, *supra; Matter of Feldman v Feldman,* 45 AD2d 320, 324). It appears, however, that the children do not enjoy a comfortable relationship with Mr. Rathbun and that defendant spends a good deal of time in his company. By her own testimony she is with him four or five evenings a week and we may properly consider this evidence in assessing the mother's priorities and her availability to the children as they reach ages when the comfort and guidance of a parent will be necessary to them (see *People ex rel. Wasserberger v Wasserberger,* 42 AD2d 93, 95-96, affd 34 NY2d 660; cf. *Matter of Feldman v Feldman, supra).* The children have lived with their father since March of 1979 and nothing in the record persuades us that his custody should now be changed for their best interests.

## III

Finally, plaintiff appeals from the judgment insofar as it directs him to pay his wife's counsel fees. Noting that the direction was made pursuant to section 237 of the Domestic Relations Law which authorizes the award of counsel fees only in favor of a wife, he asserts that the statute is unconstitutional because if literally read, it contains an impermissible gender-based classification.

This judgment was entered subsequent to the United States Supreme Court's decision in *Orr v Orr* (440 US 268) which declared a similar Alabama statute unconstitutional because it violated the equal protection clause. Although plaintiff did not challenge the constitutionality of section 237 at Trial Term, he has standing to raise the issue now *(Orr v Orr, supra,* pp 272, 273; *Childs v Childs,* 69 AD2d 406, 414-415, cert den — US —, 40 CCH S Ct Bull, B1803, mandamus den *sub nom. Childs v Appellate Div. of Supreme Ct. of N. Y., Second Judicial Dept.,* 444 US 1010). The *Orr* decision is binding on us and we hold that it shall be applied prospectively to determinations made after March 5, 1979, the date of the Supreme Court ruling (see *Childs v Childs, supra).*

We consider section 237 constitutional because we construe it to be gender neutral, authorizing relief to either spouse when appropriate (see *Childs v Childs, supra).* There is no necessity for us to remit the matter for a hearing, however, since there is sufficient evidence of the relative circumstances of the parties appearing in this record. After considering the evidence, we hold that section 237 was not unconstitutionally applied and we therefore affirm the award of counsel fees (see *Karp v Karp,* 70 AD2d 813).

The judgment should be modified by striking the fifth, seventh, eighth, ninth and tenth ordering paragraphs pertaining to the disposition of property, by ordering defendant's cause of action for rescission of the separation agreement dismissed, and by adding an ordering paragraph providing that the separation agreement dated April 19, 1977 be incorporated by reference but not merge in the judgment of divorce.

SCHNEPP, CALLAHAN, DOERR and MOULE, JJ., concur.

Judgment unanimously modified, on the law and facts, and, as modified, affirmed, without costs, in accordance with opinion by SIMONS, J. P.